ADARAND CONSTRUCTORS, INC., a Colorado Corporation, Plaintiff,

v.

Frederico PEŃA, Secretary of the Department of Transportation, Rodney E. Slater, Administrator of the Federal Highway Administration, Vincent F. Schimmoller, Administrator of Region VIII of the Federal Highway Administration, and Larry C. Smith, Division Engineer of the Central Federal Lands Highway Division, Defendants.

Civ A. No. 90–K–1413.

United States District Court, D. Colorado.

June 2, 1997.

As Amended June 4, 1997.

Todd S. Welch, Mountain States Legal Foundation, Denver, CO, for plaintiff.

Marisa J. Demeo, Charles E. Leggott, Marybeth Martin, U.S. Department of Justice, Civil Rights Division, Employment Litigation Section, Washington, DC, Stephen D. Taylor, Assistant U.S. Attorney, Denver, CO, Lisa MacPhee, Edward V.A. Kussy, Federal Highway Administration, Department of Transportation, Washington, DC, for defendants.

Franklin Lee, Craig Thompson, Minority Business Enterprises, Washington, DC, William C. McNeill, Julian A. Gross, The Employment Law Center, San Francisco, CA, Robert Golten, Boulder, CO, Court Amicae.

## MEMORANDUM DECISION
## ON REMAND

KANE, Senior District Judge.

Following remand from the United States Supreme Court and the Tenth Circuit Court of Appeals, Plaintiff Adarand Constructors, Inc., a highway construction company, seeks declaratory and permanent injunctive relief against Frederico Peña, Secretary of the Department of Transportation (DOT), Rodney E. Slater, Administrator of the Federal Highway Administration (FHA), Vincent F. Schimmoller, Administrator of Region VIII of the FHA, and Larry C. Smith, Division Engineer of the Central Federal Lands Highway Division (CFLHD).[1] Adarand asserts the race-conscious subcontracting compensation clause (SCC) program used by the CFLHD is unconstitutional, violating the due process and equal protection guarantees of the Fifth and Fourteenth Amendments, as well as the civil rights, privileges and immunities secured by the laws of the United States, and the provisions of Title VI, § 601

---

1. Each Defendant is sued in an official capacity. Frederico Peña is no longer the Secretary of the DOT. Rodney E. Slater currently holds that position. Jane Garvey is now the Acting Administrator of the FHA.

of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Pending are the parties' cross-motions for summary judgment following remand. *See Adarand Constructors, Inc. v. Peña (Adarand III),* 515 U.S. 200, 237, 115 S.Ct. 2097, 2118, 132 L.Ed.2d 158 (1995). In remanding the case, the Supreme Court held that all programs imposing race-based classifications must be adjudicated under the "strict scrutiny" standard. *Id.* at 227, 115 S.Ct. at 2113. "In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.*

While the Court ruled on the proper standard to be applied to the case at bar, it declined to render an opinion on the underlying merits. It opted instead to "remand the case to the lower courts for further consideration in light of the principles we have announced." *Id.* In explaining its decision to remand, the Court noted that certain "unresolved questions" involving the "complex regulatory regimes implicated by the use of subcontractor compensations clauses" needed to be addressed. It submitted to the lower courts the question of "whether any of the ways in which the government uses subcontractor compensation clauses can survive strict scrutiny." *Id.* at 240, 115 S.Ct. at 2119.

The prudence of remanding this case to the trial court is difficult to perceive. Both parties have stipulated to the absence of any dispute of material fact (Cross Mot. Summ. J. Tr., Dec. 20, 1996 at 29–30), and the "unresolved questions" posed by Justice O'Connor in *Adarand III* concern only issues of statutory construction relating to "the details of the complex regulatory regimes" and a number of "apparent discrepanc[ies]" the Court found in the application of the statutes and regulations involved. 515 U.S. at 238–39, 115 S.Ct. at 2118.

While it is true that the decision to require strict scrutiny "alters the playing field in some important respects," *id.,* it is equally true that the higher courts are better equipped to decide as a matter of law whether, under the proper interpretation, the statutes involved can be described as in furtherance of a compelling interest and narrowly tailored to meet that interest. As such, concerns of judicial efficiency and the desire to resolve disputes quickly would have favored the resolution of the remaining legal issues by the higher courts.

Following the remand, the Tenth Circuit Court of Appeals entered an order stating that, its own judgment having been vacated and, upon consideration of the Supreme Court's judgment, the cause was remanded to this court for further proceedings. Again, in light of the lack of a genuine issue as to any material fact, the rationale for the circuit court's remand to this trial court eludes me.

Be that as it may, the parties have briefed the issue presented upon remand, namely, whether the Defendants' use of the SCC is constitutional. An amici curiae brief has been filed by the Minority Business Enterprise Legal Defense and Education Fund, Inc. and the Mid–Peninsula Minority Contractors Association. Oral argument was heard.

Jurisdiction exists under 28 U.S.C. § 1331 and § 1343.

I grant Adarand's motion for summary judgment, and deny that of the Defendants. I issue an injunction enjoining the Defendants from administering, enforcing, soliciting bids for, or allocating any funds under the SCC program. This effectively precludes the implementation of the statutes or regulations that grant presumptive eligibility for government preference in contracting on the basis of race, i.e., the use of presumptions of social and economic disadvantage in § 8(d) of the Small Business Act, 72 Stat. 384, as amended, 15 U.S.C. § 631 *et seq.,* (SBA) and the use of percentage goals found in and promulgated pursuant to § 644(g) of the SBA, the Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA) and the Intermodal Surface Transportation Efficiency Act of 1991, Pub.L. No. 102–240, 105 Stat.1914 (ISTEA.)[2] These enactments, either *per se,* or through their implementing regulations, allow pre-

---

**2.** The Surface Transportation Assistance Act of 1982 (STAA) preceded both STURAA and ISTEA.

sumptive eligibility for a "preferred status" in federal subcontracts based on race.

## I. *Factual and Procedural Background* [3]

In 1989 the CFLHD, which is part of the DOT awarded the prime contract for a highway construction project in Colorado to Mountain Gravel & Construction Company. When Mountain Gravel solicited bids from subcontractors for the guardrail portion of the contract, Adarand, a Colorado-based highway construction company, specializing in guardrail work, submitted the low bid. Gonzales Construction, owned and operated by Frankie Gonzales, also submitted a bid.

According to the prime contract, Mountain Gravel would receive additional compensation from the government if it hired subcontractors certified as small businesses controlled by "socially and economically disadvantaged individuals." Whereas Gonzales is certified as such a business, Adarand is not. Despite Adarand's low bid, Mountain Gravel awarded the subcontract to Gonzales. An affidavit of Mountain Gravel's Chief Estimator states the company would have accepted Adarand's bid were it not for the additional payment received by hiring Gonzales.

Having lost the guardrail subcontract to Gonzales, Adarand filed a complaint seeking declaratory and permanent injunctive relief against DOT and other federal officials, claiming violation of its equal protection rights by the race-based presumptions inherent in the use of subcontracting compensation clauses.

The parties filed cross-motions for summary judgment. Judge Carrigan, now retired, granted the Defendants' motion. Relying on *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), he held the challenged federal program serves appropriate governmental objectives and was narrowly tailored to achieve the objectives of STAA and STURAA. *Adarand Constructors, Inc. v. Skinner (Adarand I),* 790 F.Supp. 240, 243–45 (D.Colo.1992).

The Tenth Circuit Court of Appeals affirmed on grounds different from those relied on by Judge Carrigan. *Adarand Constructors, Inc. v. Peña (Adarand II),* 16 F.3d 1537, 1539 (10th Cir.1994). It held the district court mistakenly determined the challenged program was authorized by STAA and STURAA, whereas, as stipulated for the purposes of the appeal, the SCC program is authorized by § 502 of the SBA, 15 U.S.C. § 644(g). Thus, the appeals court said, the constitutionality of STAA and STURAA was not at issue. Nevertheless, it held the analysis of the SCC program under the SBA was identical to the district court's analysis under STAA and STURAA. *Id.* at 1543.

Applying the "lenient standard, resembling intermediate scrutiny" adopted in *Fullilove,* as further developed in *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), to assess the constitutionality of a federal race-conscious program, the court of appeals upheld the use of SCCs. Relying on these cases, the court reasoned the federal government, acting under authority of Congress and § 5 of the Fourteenth Amendment, can legislate affirmative action programs more freely than state or local governments. *Adarand II,* 16 F.3d at 1545. Further, the appeals court rejected as without legal authority Adarand's argument that a federal agency such as the CFLHD must make specific findings of past racial discrimination to justify the SCC program. *Id.*

Whereas Judge Carrigan had found the SCC program constitutional because it was similar to that upheld in *Fullilove* and was narrowly tailored to achieve its remedial objectives, the circuit court concluded the program was constitutional because eligibility was not based solely on racial or ethnic status but on economic disadvantage. *Id.* at 1547. Further, the SCC program was " 'appropriately limited in extent and duration' " as required by *Fullilove* in that it was subject to regular " 'reassessment and reevaluation by Congress.' " *Id.* (quoting *Fullilove,* 448 U.S. at 489, 100 S.Ct. at 2780.)

The circuit court emphasized, because the SCC program did not compel contractors to subcontract with disadvantaged business en-

---

**3.** I follow closely the synopsis of the Court in *Adarand III,* 515 U.S. at ———— ————, 115 S.Ct. at 2102–04.

terprises ("DBEs"), but rather induced them to do so, it could not be said to violate equal protection requirements. *Id.* Finally, it acknowledged the lesson in *Fullilove* that " '[i]t is not constitutional defect in this program that it may disappoint the expectations of nonminority firms.' " *Id.* (quoting *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2778).

The United States Supreme Court granted certiorari to examine whether the proper standard of review had been applied by the Tenth Circuit. The Court vacated the circuit court's holding and held "[f]ederal racial classifications, like those of a state, must serve a compelling governmental interest and must be narrowly tailored to further that interest." *Adarand III,* 515 U.S. at 239, 115 S.Ct. at 2118. It remanded the case for evaluation in light of its conclusion that federal affirmative action programs, such as that at issue here, are subject not to intermediate, but to strict scrutiny review. *Id.*[4]

Writing for the majority, Justice O'Connor set forth the relevant federal laws and regulations at issue, and determined that Adarand had standing to challenge and obtain relief from SCC programs. *Id.* at 204–11, 115 S.Ct. at 2102–05. The Court then reviewed its previous decisions involving the Fifth Amendment's Due Process Clause[5] and the Fourteenth Amendment's Equal Protection Clause.[6] *Id.* at 213–14, 115 S.Ct. at 2106.

Tracing the Court's treatment of governmental classifications that have affected classes of people who have suffered societal discrimination, Justice O'Connor restated the principle of *Bolling v. Sharpe* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) that the equal protection components of the Fifth and Fourteenth Amendments are indistinguishable. *Adarand III,* 515 U.S. at 213–17, 115 S.Ct. at 2106–08. The majority emphasized it has consistently held that government racial classifications, whether created by federal or state governments, must be

subjected to the "most rigid judicial scrutiny." *Id.* at 216, 115 S.Ct. at 2107 (quoting *Toyosaburo Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944)).

The Court noted it's struggle over the past twenty years to formulate the proper standard of review for affirmative action and minority assistance programs but had resolved the issue at least in part in *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *Adarand III,* 515 U.S. at 219–21, 115 S.Ct at 2109–10. Justice O'Connor opined the Court's previous cases had analyzed governmental racial classifications with "skepticism," "consistency," and "congruence." *Id.* at 223–24, 115 S.Ct. at 2111.

According to the majority, the Court's decision in *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) deviated from the long-standing principle that both federal and state governments are held to the same equal protection duty when it held that "benign" racial classifications created by the federal government are subject to intermediate scrutiny. *Adarand III,* 515 U.S. at 223–26, 115 S.Ct at 2111–12. *Metro Broadcasting,* Justice O'Connor wrote, ignored the essential precept that all governmental racial classifications, federal and state, must be strictly scrutinized. *Id.* The majority overruled *Metro Broadcasting* to the extent that a standard of review less than strict scrutiny would be applied in any racial classification, whether created by federal, state or local government. *Id.* at 227–28, 115 S.Ct. at 2113.

In conclusion, Justice O'Connor announced the application of strict scrutiny to all, including federal, racial classifications, would ensure that only those which are narrowly tailored to serve a compelling governmental interest are tolerated. Finally the majority

---

4. Composing the majority in this case were Chief Justice Rehnquist and Justices Kennedy, O'Connor, Scalia, and Thomas. Justice O'Connor wrote the Court's opinion. Justices Scalia and Thomas wrote concurring opinions. Justices Stevens, Souter, Ginsberg and Breyer dissented, each writing an opinion with the exception of Justice Breyer.

5. "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

6. "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

stated it wished to dispel the notion that "strict scrutiny is 'strict in theory, but fatal in fact.'" *Id.* at 237, 115 S.Ct. at 2117 (quoting *Fullilove,* 448 U.S. at 519, 100 S.Ct. at 2795) (Marshall, J., concurring in judgment). The case was remanded to the lower courts for determination of the constitutionality of the SCC under a strict scrutiny standard.

## II. *Standards for Summary Judgment*

Under Federal Rule of Civil Procedure 56(c),

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment....

> While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the non-movant's claim but need only point to an absence of evidence to support the non-movant's claim. If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.

*Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996) (quoting *Wolf v. Prudential Ins. Co.,* 50 F.3d 793, 796 (10th Cir.1995)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

## III. *Directives upon Remand.*

Justice O'Connor noted several issues which must be addressed in determining whether any of the ways in which the government uses subcontractor compensation claus-

es can survive strict scrutiny. *Adarand III,* 515 U.S. at 237–38, 115 S.Ct. at 2118.

According to the majority opinion, the circuit court, following *Metro Broadcasting* and *Fullilove,* analyzed the case in terms of intermediate scrutiny. It did not address whether the interests served by the use of subcontractor compensation clauses are compelling. *Id.* Nor, Justice O'Connor said, did the Tenth Circuit address the issue of narrow tailoring in terms of strict scrutiny cases which have asked, for example, "whether there was 'any consideration of the use of race-neutral means to increase minority business participation' in government contracting." *Id.* (quoting *Croson,* 488 U.S. at 507, 109 S.Ct. at 729). The circuit court also did not consider "whether the program was appropriately limited such that it 'will not last longer than the discriminatory effect it is designed to eliminate.'" *Id.* (quoting *Fullilove,* 448 U.S. at 513, 100 S.Ct. at 2792–93).

Justice O'Connor found "unresolved questions remain concerning the details of the complex regulatory regimes implicated by the use of subcontractor compensation clauses." *Id.* Whereas the SBA's 8(a) program requires individualized inquiry into the economic disadvantage of every participant, 13 C.F.R. § 124.106(a) (1996), the DOT regulations implementing STURAA § 106(c) require no such individualized inquiry by the certifying authority, 49 C.F.R. § 23.62 (1995); 49 C.F.R. pt. 23, subpt. D, App. C (1995).

Nor, the Court noted, are the regulations clear as to whether 8(d) subcontractors must make individualized showings or whether the race-based presumption applies to social as well as economic disadvantage. *See* 13 C.F.R. § 124.106(b) (1996) (seemingly requiring such contractors to make an individualized showing), as compared with 48 C.F.R. § 19.703(a)(2) (1995) (apparently allowing them to invoke the race-based presumption for social and economic disadvantage). *Adarand III,* 515 U.S. at 238, 115 S.Ct. at 2118.

Justice O'Connor further noted "an apparent discrepancy between the definitions of which socially disadvantaged individuals qualify as economically disadvantaged for the 8(a) and 8(d) programs." *Id.* Regulations relating to 8(a) participants require a show-

ing that such person's ability to compete has been impaired "as compared to others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.106(a)(1)(i) (1996). Those governing 8(d) programs merely require a showing "as compared to others in the same or similar line of business." § 124.106(b)(1). The majority directed the lower courts to consider if distinctions such as these may have relevance to the question of whether the way in which the government uses subcontractor compensation clauses can survive strict scrutiny.

### IV. *The Complex Regulatory Regimes.*

In the First Amended Complaint, filed January 22, 1996, Adarand seeks, *inter alia,* a declaration that § 105(f) of STAA, § 106(c) of STURAA, § 1003(b) of ISTEA, § 8(d) of the SBA (15 U.S.C. § 637(d)) and 15 U.S.C. § 644(g), the regulations promulgated thereunder, and the contract provisions promulgated pursuant to those statutes and regulations are unconstitutional as applied to highway construction in the State of Colorado and thus deprive Adarand of its constitutional rights. (First Am. Compl. ¶¶ 6, 8–21, 31, and Prayer for Relief).

· In brief, Adarand states it has challenged as unconstitutional "all of the statutory provisions from which [the] Defendants claim authority to award highway construction contracts in Colorado on the basis of race." (Pl.'s Reply Mem. at 1 n. 1).[7] This is somewhat broader than the Supreme Court's characterization of the issue before this court, namely "whether any of the ways in which the federal government uses subcontractor clauses can survive strict scrutiny...." *Adarand III,* 515 U.S. at 238, 115 S.Ct. at 2118.

As the Court noted, this case concerns "complex regulatory regimes implicated by the use of subcontractor compensation clauses." *Id.* First, a number of provisions in the SBA, are implicated. According to the SBA, it is the policy of the United States that

> small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individu-

als, and small business concerns owned and controlled by women shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts....

15 U.S.C. § 637(d)(1).

In order to achieve these goals, § 637(d) (the "8(d) program") requires that certain language be included in all contracts, with three limited exceptions, let by federal agencies. The required clause includes the policy statement set out above, and further states: "The contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract." 15 U.S.C. § 637(d)(3)(B).

A "small business concern owned and controlled by socially and economically disadvantaged individuals" is defined as a small business concern "which is at least 51 per centum owned by one or more socially and economically disadvantaged individuals," and "whose management and daily business operations are controlled by one or more of such individuals." 15 U.S.C. § 637(d)(3)(C)(i) and (ii). The SBA also requires the following contractual language:

> The contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act.

> . . . . .

> Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as ... a small business concern owned and controlled by socially and economically disadvantaged individuals....

15 U.S.C. §§ 637(d)(3)(C), 637(d)(3)(E).

The finding "by the Administration" in the quoted passage refers to certification by the Small Business Administration under the 8(a) set aside program. *See* 15 U.S.C. § 637(a).

---

**7.** Adarand's standing to raise these issues is discussed below.

Unlike the 8(d) program described above, which mandates the inclusion of the described clause in contracts between federal agencies and general contractors, the 8(a) program substantially alters the federal contracting process by allowing the Administration to act as an intermediary between a contracting agency and the end contractors who are to perform the work. *Compare* 15 U.S.C. § 637(a) *with* 15 U.S.C. § 637(d).

When the 8(a) program is invoked, the Administration may "enter into contracts with the United States Government and any department, agency, or officer thereof ... to furnish articles, equipment, supplies, services, or materials ... or to perform construction work for the Government." 15 U.S.C. § 637(a)(1)(A). The Administration will then "arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns ...." who have been certified as § 8(a) program participants. 15 U.S.C. § 637(a)(1)(B).

Section 637(a)(1)–(21) and the implementing regulations at 13 C.F.R. §§ 124.100–124.113 (1996) provide an elaborate set of guidelines to be used by the Administration in deciding whether a business is eligible for the 8(a) program, including general definitions of social and economic disadvantage.[8]

Under the SBA, "socially disadvantaged" persons are those "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member [sic] of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).

The regulations augment this definition, stating that, in the absence of evidence to the contrary, individuals claiming membership in certain racial groups, including Black Americans, Hispanic Americans, Native Americans, and Asian Pacific Americans, are presumptively designated as socially disadvantaged for the purposes of the SBA. 13 C.F.R. § 124.105(b) (1996). Individuals who are not members of the designated groups, but who desire to participate in the 8(a) program

must establish, "on the basis of clear and convincing evidence," that they meet a five part test in order to be certified as socially disadvantaged. 13 C.F.R. § 124.105(c) (1996).

The first part of this test is that the claimed social disadvantage "must stem from ... color, ethnic origin, gender, physical handicap, [or] long-term residence in an environment isolated from the mainstream of American society ....'" § 124.105(c)(1)(i). In addition, the regulations require that an individual not belonging to one of the specified groups prove that "he or she has personally suffered social disadvantage," that the claimed disadvantage is "rooted in treatment which he or she has experienced in American society, not in other countries," is "chronic and substantial, not fleeting or insignificant," and has "negatively impacted on his or her entry into and/or advancement in the business world." § 124.105(c)(1) (ii) to (v).

"Economically disadvantaged" individuals are defined by § 8(a) of the SBA as socially disadvantaged persons "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). As the Supreme Court recognized in *Adarand III*, the regulations provide two different standards for designation as "economically disadvantaged," depending on whether the question arises under the 8(a) program or the 8(d) mandates. 515 U.S. at 207–08, 115 S.Ct. at 2103.

Section 124.106(a) defines economic disadvantage for the purposes of the 8(a) program by comparing the individual seeking certification with "others in the same or similar line of business *who are not socially disadvantaged* ...." 13 C.F.R. § 124.106(a) (1996) (emphasis added). By contrast, § 124.106(b), which applies to "the section 8(d) Subcontracting Program and other programs requiring SBA's determination of disadvantaged status," requires the Administration to

---

**8.** As discussed below, these definitions are used to supplement the eligibility thresholds for § 8(d) of the SBA and the meaning of "social and economic disadvantage," as applied under the 8(d) program, is adopted by both STURAA and ISTEA.

compare an individual seeking designation as "economically disadvantaged" only with "others in the same line of business...." 13 C.F.R. § 124.106(b) (1996).

Under both § 124.106(a) and § 124.106(b), the Administration determines economic disadvantage by examining "[t]he personal financial condition of the individual(s) claiming disadvantaged status, including that individual's access to credit and capital; the financial condition of the applicant concern; and the applicant concern's access to credit, capital and markets." 13 C.F.R. § 124.106(a)(2) (1996); 13 C.F.R. § 124.106(b)(1) (1996).

However, for the purposes of the 8(d) and other programs requiring SBA's determination of disadvantaged status, the Administration is required to "apply standards to each factor that are *less restrictive* than those applied when determining economic disadvantage for the purposes of the 8(a) program." 13 C.F.R. § 124.106(b)(1) (1996) (emphasis added). According to the regulations, this approach "corresponds to the Congressional [sic] intent that partial or complete achievement of a concern's 8(a) program business development goals should not necessarily preclude its participation in other Federal [sic] procurement programs for ... socially and economically disadvantaged individuals." [9] 13 C.F.R. § 124.106(b)(1) (1996).

This "less restrictive" examination may be at odds with the plain language of the SBA itself, insofar as the 8(d) provisions direct prime contractors to "presume that socially and economically disadvantaged individuals include [the specified racial groups] or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act." 15 U.S.C. § 637(d)(3)(C). This language, standing alone, grants the presumption of both social and economic disadvantage (and thus eligibility for programs relying on the 8(d) usage of

these terms) to members of the listed minority groups without reference to their economic status, in addition to allowing those actually found to be economically disadvantaged under the requirements of § 8(a) to qualify.

As Justice O'Connor noted, a further set of regulations implementing the 8(d) program supports this reading by stating that "[i]ndividuals who certify that they are members of named groups (Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, Subcontinent–Asian Americans) are to be considered socially and economically disadvantaged." *Adarand III,* 515 U.S. at 207, 115 S.Ct. at 2103 (quoting 48 C.F.R. § 19.001 (1996)); *see also* 48 C.F.R. § 19.703(a)(2) (1996) (allowing individuals "who certify that they are members of [the] named groups ... [to] represent themselves as socially and economically disadvantaged").

Clearly, the SBA statutory language creating the 8(d) program is inconsistent with certain regulations governing certification of social and economic disadvantage in addition to the regulations themselves being mutually inconsistent. This leaves "some uncertainty as to whether the 8(d) subcontracting program requires an individualized showing of economic disadvantage." *Adarand III,* 515 U.S. at 207, 115 S.Ct. at 2103.

While the regulations at 13 C.F.R. 124.106(b) (1996) inquire into the actual financial condition of the applicant, the plain language set forth in § 637(d) of the SBA and the regulations at 48 C.F.R. 19.001 (1996), do not require such an inquiry in determining eligibility for the 8(d) program. This demonstrates that the framework of the SBA permits the promulgation of regulations which, like § 8(d) itself, allow a presumption of both social and economic disadvantage based entirely on membership in certain racial groups.

Under both the 8(a) and the 8(d) programs, the race-engendered presumptions of

---

**9.** The regulations limit overall participation in the 8(a) program, or the program term, to a period of nine years from the date of certification. 13 C.F.R. § 124.110 (1996). An 8(a) business concern may be "graduated from the program" when it has achieved the "targets, objectives and goals set forth in its business plan prior to the expiration of its Program Term

[sic], and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) program." 13 C.F.R. § 124.208(a) (1996). In addition to graduation, an 8(a) participant can also have its program term prematurely terminated "for good cause," which includes the occurrence of any of twenty-five events listed in 13 C.F.R. § 124.209(a) (1996).

disadvantage may be rebutted if a third party comes forward with evidence that the participant in question is not, in fact, socially or economically disadvantaged. *See* 13 C.F.R. §§ 124.111(c)–(d) and 124.601–609 (1996). Adarand points out that only third parties may come forward to initiate a rebuttal of presumptive disadvantage, and that no such duty falls upon the Defendants or any other governmental entity.

The SBA further provides "[t]he President shall annually establish Government-wide [sic] goals for procurement contracts awarded to ... small business concerns owned and controlled by socially and economically disadvantaged individuals...." 15 U.S.C. § 644(g)(1). This goal "shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." *Id.*

In addition, the SBA requires each federal agency to establish goals for the participation by small business concerns owned and controlled by socially and economically disadvantaged individuals in procurement contracts of such agency. 15 U.S.C. § 644(g)(2). These goals "shall realistically reflect the potential of ... small business concerns owned and controlled by socially and economically disadvantaged individuals ... to perform such contracts and to perform subcontracts under such contracts." *Id.*

As the Court noted in *Adarand III*, 515 U.S. at 205–07, 115 S.Ct. at 2102, the goals described in 15 U.S.C. § 644(g)(1) and (2) are in furtherance of the policy stated in 8(d)(1), that small business concerns owned and controlled by socially and economically disadvantaged individuals have the maximum opportunity to participate in the performance of contracts let by any federal agency.

The FHA's own goal as applied to its Federal Lands Highway Program (FLHP), and thus to contracts let by the CFLHD was "somewhere around 12[to] 15 percent" at times pertinent to this litigation. (Defs.' Supp'l Ex. Supp. Mot. Summ. J., Depo. James L. Robinson, CFLHD Engineer, ("Robinson Depo.") at 44, line 16.) Statements on the record also indicate that when

this goal was not met, CFLHD officials would receive a "chat from a supervisor." *Id* at 45, line 19.

In addition to the minimum 5 percent goal provided by the SBA and the 12 to 15 per cent goals adopted by the FHA and applied to the CFLHD pursuant to § 644(g) of the SBA, the contract at issue was also subject to goals included in STURAA and ISTEA, both DOT appropriations measures.

It is undisputed that the initial funding for the West Dolores project and the contract at issue was provided by the Highway Trust Fund under STURAA. ISTEA later superseded STURAA and provided the funding for change orders and supplemental agreements for the West Dolores project.

Section 106(c)(1) of STURAA requires that "not less than 10 percent" of the funds appropriated under the act "shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." 101 Stat. 145. ISTEA, in § 1003(b), adopts the 10 percent goal found in STURAA. 105 Stat. 1919.

Significantly, both STURAA and ISTEA state the term "socially and economically disadvantaged individual[s]" has the meaning of such term under § 8(d) of the SBA "and relevant subcontracting regulations promulgated pursuant thereto." STURAA § 106(c)(2)(B), 101 Stat. 146; ISTEA § 1003(b)(2)(B), 105 Stat. 1919–1920. Accordingly, under STURAA and ISTEA, the race-based presumption contained in 15 U.S.C. § 637(d) applies for the purposes of determining both social and economic disadvantage, although the somewhat contradictory regulations promulgated pursuant to the SBA also apply. Thus, business concerns owned and controlled by Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, in addition to other groups or individuals certified under the more restrictive tests provided by the SBA's 8(a) program are considered both socially and economically disadvantaged for the purposes of STURAA and ISTEA. 101 Stat. 146; 105 Stat. 1919–20; 15 U.S.C. § 637(d)(3)(C); 13 C.F.R. § 124.106(b) (1996).

The Secretary of Transportation, pursuant to the requirements in STURAA, established "minimum uniform criteria for State governments to use in certifying whether a concern qualifies" for purposes of meeting the act's goals for disadvantaged businesses. STURAA § 106(c)(4), 101 Stat. 146. These regulations require the certifying authority to presume both social and economic disadvantage (i.e., eligibility to participate) if the applicant belongs to the listed racial groups (or is a woman). 49 C.F.R. § 23.62 (1995); 49 C.F.R. pt. 23, subpt. D, App. C (1995).[10] As with the SBA programs, third parties may come forward with evidence to rebut the presumption of disadvantage for any particular business. 49 C.F.R. § 23.69 (1995).

The SCC challenged by Adarand in this action was developed by the FHA under the FLHP as a means to comply with the minimum 5 percent goals provided by § 644(g) of the SBA, the 12 to 15 percent goals adopted by the FHA pursuant thereto, and the 10 percent goals set forth in STURAA and ISTEA.[11] A uniform version of the SCC was established by the Administrator of the FLHP in early 1981. (Defs.' Stmt. Undisp. Mat. Facts ¶ II.A.31.)

The SCC at issue reads:

108.01 *Subcontracting.* This subsection is supplemented to include a Disadvantaged Business Enterprise (DBE) Development and Subcontracting Provision as follows:

Monetary compensation is offered for awarding subcontracts to small business concerns owned and controlled by socially and economically disadvantaged individuals. . . .

A small business concern will be considered a DBE after it has been certified as such by the U.S. Small Business Administration or any State Highway Agency [sic]. Certification by other Government [sic] agencies, counties, or cities may be acceptable on an individual basis provided the Contracting Officer [sic] has determined the certifying agency has an acceptable and viable DBE certification program. If the Contractor [sic] requests payment under this provision, the Contractor [sic] shall furnish the Engineer [sic] with acceptable evidence of the subcontractor(s) [sic] DBE certification and shall furnish one certified copy of the executed subcontract(s).

Compensation is provided to the Contractor [sic] to locate, train, utilize, assist, and develop DBE's to become fully qualified contractors in the transportation facilities construction field. The Contractor [sic] shall also provide direct assistance to disadvantaged subcontractors in acquiring necessary bonding, obtaining price quotations, analyzing plans and specifications, and planning and management of the work. . . .

．　　．　　．　　．　　．

**10.** The latter regulations entitled "Guidance for making Determinations of Social and Economic Disadvantage" are illustrative of Justice Stevens' comment that "the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals." *Fullilove,* 448 U.S. at 534–35 n. 5, 100 S.Ct. at 2803 n. 5 (Stevens J. dissenting). I refer in particular to the following:

Recipients should continue the existing practice of making their own judgments about whether the individual is in fact a member of one of the presumptive groups. If an individual has not maintained identification with the group to the extent that he or she is commonly recognized as a group member, it is unlikely that he or she will in fact have suffered the social disadvantage which members of the group are presumed to have experiences [sic]. If an individual has not held himself or herself out to be a member of one of the groups, has not acted as a member of a community of disadvantaged persons, and would not be iden-

tified by persons in the population at large as belonging to the disadvantaged group, the individual should be required to demonstrate social disadvantage on an individual basis.

49 C.F.R., Subpt. D, App. C (1995).

**11.** The Defendants note the CFLHD has sought to meet the DBE goals established by the SBA, STURAA and ISTEA in several ways, including: 1) contract awards to small disadvantaged business as prime contractors; 2) contracts made with the SBA and set aside for 8(a) certified program participants pursuant to the SBA's 8(a) program; and 3) through subcontracting by prime contractors to small disadvantaged businesses, including such contracts under the SCC. (Defs.' Stmt. Undisp. Mat. Facts ¶ 31, n. 7.) The Defendants maintain, and Adarand does not dispute, that the challenge in this action is based only on the use of the SCC to meet the various goals. *Id.*

The Contractor [sic] will become eligible to receive payment under this subcontracting compensation provision when the dollar amount (based on final subcontracted amount) of the disadvantaged business enterprise subcontract(s) awarded exceeds 10 percent of the original contract amount. The Contractor [sic] will be paid an amount computed as follows:

1. If a subcontract is awarded to one DBE, 10 percent of the final amount of the approved DBE subcontract, not to exceed 1.5 percent of the original contract amount.

2. If subcontracts are awarded to two or more DBEs, 10 percent of the final amount of the approved DBE subcontracts, not to exceed 2 percent of the original contract amount.

(Defs.' Mot. Summ. J., Ex. 1 at I–24, I–25.)

Mountain Gravel, the prime contractor in this case, had to hire a subcontractor certified as a DBE in order to benefit from this SCC. In addition, the terms of the SCC allowed the additional financial benefits to attach to Mountain Gravel only where more than 10 percent of the original contract amount was awarded to one or more DBEs.

As explained, DBE certification can come from one of three basic sources, all part of the statutory authority giving rise to the use of SCCs. First, a business may be granted DBE status as an ancillary benefit to meeting the requirements for certification as a participant in the SBA's 8(a) program. 15 U.S.C. § 637(a). A business so certified, while entitled to a presumption of social disadvantage if owned and controlled by individuals belonging to certain minority groups, is still required to prove actual economic disadvantage. *Id.* However, a business like Adarand, which is not owned by members of the listed racial groups is required to meet a rigid five-part test before a finding of social disadvantage can be made. 13 C.F.R. § 124.105(c) (1996).

Second, a business can be certified as a DBE under the less restrictive requirements set forth in the SBA's 8(d) provisions. 15 U.S.C. § 637(d). The statutory language enacted by Congress appears to grant a race-based presumption of both social and economic disadvantage, such that one could conceivably be certified as a DBE under the 8(d) program on the basis of race alone. *Id.* However, as noted, the regulations appear to require some showing of actual economic disadvantage—albeit under some lesser standard than required for the same finding under § 8(a). *See* 13 C.F.R. § 124.106(b) (1996).

Third, a concern can be certified by a state highway agency pursuant to the DOT regulations, which like the 8(d) SBA provisions, provide for race-based presumptions of both social and economic disadvantage. 49 C.F.R. § 23.62 (1995); 49 C.F.R. pt. 23, subpt. D, App. C (1995).

Under the SCC at issue, "a small business concern will be considered a DBE after it has been certified as such by the U.S. Small Business Administration or any State Highway Agency. Certification by other Government [sic] agencies . . . may be acceptable on an individual basis . . ." (Defs.' Mot. Summ. J., Ex. 1 at I–24.)

At the time of the challenged award, the CFLHD did not itself certify businesses as DBEs. Gonzales was certified as a DBE by the State of Colorado Department of Highways in 1985 pursuant to STURAA and the implementing DOT regulations. See 49 C.F.R. § 23.62 (1995); 49 C.F.R. pt. 23, subpt. D, App. C (1995) (Stmt. Mat. Facts Not Disp. ¶ 36; Defs.' Stmt. Undisp. Mat. Facts, ¶ 19.) In granting Gonzales DBE certification, the State of Colorado presumed that Frankie Gonzales was both socially and economically disadvantaged. (Stmt. Mat. Facts Not in Dispute ¶ 35.)

## V. *Standing.*

Adarand seeks a declaration that § 105(f) of STAA, § 106(c) of STURAA, § 1003(b) of ISTEA, § 8(d) of the SBA (15 U.S.C. § 637(d)) and 15 U.S.C. § 644(g) and the regulations promulgated thereunder, and the contract provisions promulgated pursuant to those statutes and regulations are unconstitutional as applied to highway construction in the State of Colorado and thus deprive Adarand of its constitutional rights. (First Am. Compl. ¶¶ 6, 8–21, 31, and Prayer for Relief).

In reviewing the issue of standing, the Supreme Court concluded Adarand has standing to seek forward looking relief against any future use of subcontractor compensation clauses. *Adarand III,* 515 U.S. at 211–12, 115 S.Ct. at 2105. Based on the deposition testimony of Adarand's general manager to the effect that the company bid on every guardrail project in Colorado, the Court found Adarand had "made an adequate showing that sometime in the relatively near future it will bid on another government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id.*

The Court noted it is not necessary for the aggrieved party to allege that it "'would have obtained the benefit but for the barrier in order to establish standing.'" *Id.* (quoting *General Contractors v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). This renders any dispute of fact as to the reason why Mountain Gravel awarded the contract to Gonzales rather than to Adarand neither material to, nor preclusive of, the entry of summary judgment.

On the issue of standing, the Defendants assert Plaintiff's description of the alleged components of the race-based program encompasses § 8(a) of the SBA, 15 U.S.C. § 637(a), and the DOT "federal aid" grants to state and local governments funded, in part, by STURAA and ISTEA. These allegations, the Defendants argue, are beyond the scope of this litigation because Adarand has limited its constitutional challenge to highway construction contracting in Colorado. (Am. Compl., Prayer for Relief, ¶¶ 1, 2.) Further, the Defendants state, Adarand has not alleged nor offered any evidence that it could have bid on any DOT federal aid or 8(a) projects in Colorado. Accordingly, the Defendants maintain Adarand lacks standing to challenge 15 U.S.C. § 637(a) and its implementing regulations nor any aspect of STURAA, ISTEA, or 49 C.F.R. Part 23 (1995) that goes beyond the SCC.

In reply, Adarand states its challenge is not solely to the SCC but to all of the statutory provisions from which the Defendants claim authority to award highway construction contracts in Colorado on the basis of race. It maintains each of the statutes and regulations it cites in the Amended Complaint are at issue. STURAA and ISTEA provided the funding for the West Dolores Project on which Adarand was denied the guardrail subcontract; both statutes incorporate the presumption for minority groups listed in 15 U.S.C. § 637(d) and other groups listed in 13 C.F.R. § 124.105(b) (1996).

The SBA, 15 U.S.C. § 637(d)(1), (2), and (3), states that DBEs "shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency," and all such contracts shall include certain language, including the statement that "[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged" Further, the SBA, 15 U.S.C. § 644(g) states each federal agency shall set goals for DBE participation that will represent "the maximum practicable opportunity."

Adarand notes the regulations implementing the SBA are found at 13 C.F.R. § 124.101 *et seq.* (1996), 48 C.F.R. § 19.000 (1995) and 48 C.F.R. § 52.219–8 (1996). Section 124.101 states that to participate in the 8(a) program, an individual must meet all the requirements set forth in § 124.102 through § 124.109. 13 C.F.R. § 124.101 (1996). Section 124.105 defines "social disadvantage" and states that members of certain minority groups are presumed to be "socially and economically disadvantaged." 13 C.F.R. § 124.105 (1996).

Adarand points out 48 C.F.R. § 19.001 (1996) is the definition section, containing a definition of small, disadvantaged business concern, while § 19.703 states that to be eligible as a subcontractor under the program, a concern must be a small business or a DBE and that "Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, Subcontinent–Asian Americans" are presumed to be DBEs. Further, 48 C.F.R. § 52.219–8 (1996) has the same presumption as 15 U.S.C. § 637(d).

Finally, Adarand asserts, 49 C.F.R. Part 23 (1995) implementing STURAA and IS-TEA, 49 C.F.R. § 23.53 (1995) sets forth the requirements to qualify as a DBE (referred to as "MBE"), and § 23.62 presumes certain minority groups to be both "socially and economically disadvantaged" and forbids the State of Colorado from investigating either the social or economic status of members of those groups.[12]

Adarand states these are the statutory provisions the Defendants claim gave them authority to award contracts in the Colorado highway industry based on race. Because this lawsuit implicates all the aforesaid statutes and regulations, Adarand argues it has standing to challenge each of these statutory provisions. The SCC, Adarand declares, is one method the Defendants use to implement the race-based statutes at issue, and therefore each of the statutes is unconstitutional as applied in this case.

The Supreme Court concluded Adarand has standing to seek forward-looking relief in the form of declaratory and injunctive relief against any future use of subcontractor compensation clauses. *Adarand III*, at 211–12, 115 S.Ct. at 2105. The Court noted the facts of the case "implicate a complex scheme of federal statutes and regulations to which we now turn." *Id.* at 205, 115 S.Ct. at 2102. It then discussed the relevant statutes and regulations as set out above.

In concluding the majority opinion, Justice O'Connor noted "unresolved questions remain concerning the details of the complex regulatory regimes implicated by the use of subcontractor compensation clauses." *Id.* at 238, 115 S.Ct. at 2118. The Court then reiterated the various statutes and regulations at issue. It has therefore determined that Adarand has standing to challenge the race-based program involving use of SCCs, and, by implication, all those statutes and regulations forming the basis of such program. This includes the race-based presumptions of disadvantage that form the basis for DBE certification in most circumstances, as well as the SBA, STURAA, and ISTEA provisions that establish percentage

"goals" for federal contract participation by concerns presumed eligible.

Adarand does not challenge the SBA's 8(a) program, 15 U.S.C. § 637(a), in and of itself, although the FLHP uses that program to meet the DBE participation goals established by § 644(g) of the SBA and § 106(c) of STU-RAA. Nor do I believe Adarand would have standing to do so, since the 8(a) program does not involve the use of SCCs. Nevertheless the 8(a) program, 15 U.S.C. § 637(a), and regulations promulgated thereunder are implicated to the extent that the definitions of "social and economic disadvantage" contained therein are used to supplement the definition of those terms under the SBA's § 8(d) program and implementing regulations.

## VI. *Strict Scrutiny.*

In remanding this case to the lower courts, the Court directed them to determine "whether any of the ways in which the Government uses subcontractor compensation clauses can survive strict scrutiny." *Adarand III*, 515 U.S. at 238, 115 S.Ct. at 2118.

"[A]ll governmental action based on race . . . should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws [under the Fifth or Fourteenth amendment] has not been infringed." *Adarand III*, at 227, 115 S.Ct. at 2112. "All racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.*

The strict scrutiny test involves two questions. The first is whether the interest cited by the government as its reason for injecting the consideration of race into the application of law is sufficiently compelling to overcome the suspicion that racial characteristics ought to be irrelevant so far as treatment by the government is concerned. The second is whether the government has narrowly tailored its use of race, so that race-based classifications are applied only to the

---

**12.** The State of Colorado apparently used these regulations in certifying Gonzales Construction, which was awarded the guardrail subcontract on the West Dolores Project.

extent absolutely required to reach the proffered interest.

A "compelling" interest is required "because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic...." *Fullilove,* 448 U.S. at 533–535, 100 S.Ct. at 2803–04 (Stevens, J., dissenting). The use of race must be "narrowly tailored" to the achievement of that interest because racial preferences create both a benefit and a burden, and when the burden touches "upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 299, 98 S.Ct. 2733, 2753, 57 L.Ed.2d 750 (1978) (opinion of Powell, J).

The strict scrutiny test is thus a recognition that while classifications based on race may be appropriate in certain limited legislative endeavors, such enactments must be carefully justified and meticulously applied so that race is determinative of the outcome in only the very narrow circumstances to which it is truly relevant. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273–74, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion of Powell, J.) (" 'Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees' ") (quoting *Fullilove,* 448 U.S. at 491, 100 S.Ct. at 2781).

### A. *Compelling Governmental Interest.*

■ Compelling interest is the linchpin of constitutionality under strict scrutiny. The narrow tailoring requirement comes into play only when the governmental action under review is shown to be supported by such interest. Justice O'Connor noted "[t]he Court of Appeals did not decide the question of whether the interests served by the use of subcontractor compensation clauses are properly described as 'compelling.' " *Adarand III,* 515 U.S. at 237, 115 S.Ct. at 2118. In remanding the case, however, the Court did not give any meaning to the phrase "com-

pelling interest," either by a definition or by illustration.

In view of my conclusion that the SCC program is not narrowly tailored so as to pass strict scrutiny muster, the following determination concerning compelling governmental interest may be regarded as *obiter dicta.* Nevertheless, I consider the discussion of compelling interest to be important, particularly in light of the lacuna left by the Court on the subject when it remanded the case.

There appears to be only one compelling interest recognized by the Supreme Court to justify racial classifications, namely remedying past wrongs. *See Croson,* 488 U.S. at 493, 109 S.Ct. at 722 (plurality opinion) ("[u]nless [racial classifications] are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility"). However, " '[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.' " *Id.* at 497, 109 S.Ct. at 724 (quoting *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848). Further, consideration of race or ethnicity by a university for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment. *Hopwood v. Texas,* 78 F.3d 932, 944 (5th Cir.1996) (citing Powell J.'s opinion in *Bakke,* noting that, although it was not binding, no case since has accepted diversity as a compelling state interest under a strict scrutiny analysis).

Adarand argues the Defendants have not shown a compelling governmental interest in the use of race to award federal contracts, asserting that they admit there has been no previous discrimination by them on the basis of race in awarding of federal highway construction contracts in Colorado. Relying on *Croson's* requirement that there must be specific findings of past state-sponsored discrimination before adopting a race-based remedy, Adarand maintains Congress has adopted such a remedy in the absence of any history of state-sponsored discrimination.

Adarand further argues the evidence proffered by the Defendants to support the adoption by Congress of the race-based program reveals at most two isolated incidents of dis-

crimination. Moreover, Adarand states the officials who managed the federal government highway construction program in the states that comprise the CFLHD testified they knew of no studies or evidence that showed discrimination in the highway construction industry in Colorado.

Citing *Croson*, 488 U.S. at 497, 109 S.Ct. at 723–24, and *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848, Adarand claims there must be particularized findings that the federal government has discriminated on the basis of race in the awarding of federal highway construction contracts in Colorado. According to Adarand, the Defendants have not presented any particularized findings of discrimination by federal actors in the highway construction industry.

The Defendants argue Adarand has misconstrued *Croson* and *Wygant* and failed to recognize Congress' unique role as the national legislature. They state Adarand's reliance on *Croson* and *Wygant* is misplaced as it fails to recognize the fundamental differences between the national legislature, which authorized the programs at issue here, and the state and local bodies which promulgated the programs at issue in those cases.

According to the Defendants, Congress has the authority and obligation to address the nationwide problem of discrimination against DBEs in the construction industry with national legislation. While *Adarand III* clarified that affirmative action programs enacted by Congress are subject to strict scrutiny, the Defendants contend the Court did not question Congress' authority under § 5 of the Fourteenth Amendment, the enforcement clauses of the Thirteenth and Fifteenth Amendments, the Commerce Clause or Spending Power, to impose broad measures for remedying discrimination that impacts victims nationwide.

The Defendants maintain the Court has consistently distinguished the broad constitutional authority given Congress to remedy discrimination from the limited power of state and local governments. "That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such rem-edies are appropriate. Section 1 of the Fourteenth Amendment is an *explicit* constraint on state power, and the states must undertake any remedial efforts in accordance with that provision." *Croson*, 488 U.S. at 490, 109 S.Ct. at 720 (emphasis in original).

Since Congress' scope of authority differs from that of states and local governments, the Defendants argue, the evidence required to demonstrate a compelling governmental interest to exercise its authority will likewise be different. It is the Defendants' position that Congress is not required to make the specific detailed analysis set forth in *Croson* to demonstrate a compelling governmental interest for Congress' action under a strict scrutiny standard of review.

Adarand responds that all of the arguments made by the Defendants that Congress has unique powers to remedy nationwide discrimination were already rejected by the Supreme Court in *Adarand III* ("The Court's concept of 'congruency' assumes that there is no significant difference between a decision by the Congress of the United States to adopt an affirmative action program and such a decision by a State or a municipality. In my opinion that assumption is untenable. It ignores important practical differences between federal and state or local decision makers." *Adarand III*, 515 U.S. at 249, 115 S.Ct. at 2123 (Stevens, J. dissenting)).

Moreover, Adarand states the dissents filed in *Adarand III* reflect the majority opinion rejected the argument that *Fullilove* controls the decision of this court. ("The statutory scheme must be treated as constitutional if *Fullilove v. Klutznick* is applied." *Id.* at 265, 115 S.Ct. at 2131 (Souter J., dissenting.)). Finally, Adarand relies on the majority's remark that "to the extent (if any) that *Fullilove* held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling," *Adarand III*, 515 U.S. at 235, 115 S.Ct. at 2117. Thus, states Adarand, the strict scrutiny standard of review required of Congress is the same as that required of state or local governments.

The Defendants reply there is no dispute that congressionally-enacted affirmative action programs are subject to strict scrutiny. However, they state, the issue is whether congressional actions should be assessed as if Congress were limited to the same powers and jurisdictional scope as a local government entity, as Adarand argues. It is the Defendants' position that Congress, unlike state and local governments, legislates on a nationwide basis that must be recognized by this court. This, the Defendants maintain, is not inconsistent with the strict scrutiny standard, but is rather a factor be taken into account in applying it.

The diametric arguments of the parties concerning what constitutes a compelling governmental interest for Congress and the evidence required to establish such interest are not surprising. They reflect the majority's failure in *Adarand III* to define the parameters of Congress' powers under § 5 of the Fourteenth Amendment "to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

While Justice O'Connor unified state and federal race-conscious remedies under one analytical standard, her opinion failed to define the parameters of Congress' Section 5 powers. Noting that various members of the Court have taken different views of Congress' Section 5 powers, Justice O'Connor stated "[w]e need not, and do not, address these differences today." *Adarand III*, 515 U.S. at 231, 115 S.Ct. at 2114. Not surprisingly, Justice O'Connor side-stepped this issue of Congress' acknowledged unique Section 5 powers, since addressing it would have opened a Pandora's box that would have significantly weakened the notion of congruence.

Later in the same paragraph, however, the majority stated that "Justice Stevens' suggestion that any Member of this Court has repudiated in this case his or her previously expressed views on the subject ... is incorrect." *Id.* Thus, it appears that Justice O'Connor's assertion in *Croson*, that Congress has the ability under Section 5 to recognize and address racial discrimination, has been left undisturbed.

Given the uncertainty as to the extent to which courts should defer to Congress' Section 5 authority, I nevertheless find no support for Adarand's contention that the Defendants' use of the SCC in Colorado will pass constitutional muster only if Congress made particularized findings of discrimination in the highway industry in Colorado. Adarand's reliance on *Croson* in this regard is misplaced. There, Justice O'Connor noted

other governmental entities might have to show more than Congress before undertaking race-conscious measures: "The degree of specificity required in the findings of discrimination and the breadth of the discretion in the choice of remedies may vary with the nature and authority of the governmental body."

*Croson*, 488 U.S. at 489, 109 S.Ct. at 719 (quoting *Fullilove*, 448 U.S. at 515–16, n. 14, 100 S.Ct. at 2794, n. 14 (Powell, J., concurring)). Further, Justice O'Connor stated: "The city [of Richmond] is not just like the federal government with regard to the findings it must make to justify race-conscious remedial action." *Croson*, 488 U.S. at 491, 109 S.Ct. at 720.

In *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), the Court recognized Congress' authority to legislate nationwide remedies to nationwide problems. There, the State of Arizona argued that application of a congressional ban on the use of literacy tests nationwide was improper because the racial discrimination Congress was addressing arose elsewhere in the country. *Id.* at 233, 91 S.Ct. at 319. The Court held unanimously that Congress was not required to make independent findings that circumstances in a particular state met with Congress' assessment of a national problem before federal law could be applied to that state. *Id.*

In imposing a nationwide ban on literacy tests, Congress has recognized a national problem for what it is—a serious national dilemma that touches every corner of our land. In this legislation Congress had recognized that discrimination on account of color and racial origin is not confined to the South, but exists in various parts of the country. Congress has decided that the

way to solve the problem of racial discrimination is to deal with nationwide discrimination with nationwide legislation.

*Id.* at 133–34, 91 S.Ct. at 269 (citation omitted).

The amici brief, supporting the Defendants, cites *Croson* to the effect that "Congress, unlike any State ... has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment." 488 U.S. at 490, 109 S.Ct. at 720. This includes "the power to define situations which [it] determines threaten principles of equality and to adopt prophylactic rules to deal with those situations." *Id.* While this idea is consistent with the authority recognized in *Oregon v. Mitchell,* it may not prove dispositive regarding the use of racial classifications challenged here. Indeed, a fundamental distinction is being lost.

The congressional enactment at issue in *Mitchell* represented a clear example of a "prophylactic rule." It was a ban, a protective barrier designed to prevent a racial harm, namely the use of literacy tests to exclude African Americans from voting at the polls. The SCC, however, is more reparational than prophylactic in nature. The contract clause here seeks to overcome racial barriers, not by prohibiting them at their source, but by using financial incentives to encourage prime contractors to pass over low bidding subcontractor firms not owned by members of certain minority groups. Enforcing the right to vote of a member of a minority group does not require, *ipso facto,* the denial of that same right to anyone else.

Regardless, nothing in *Adarand III* or any other Supreme Court decision persuades me that in subjecting a statutory or regulatory scheme created by Congress to strict scrutiny, one is to ignore Congress' ability to legislate nationwide to address nationwide problems thus placing it on the same constitutional plane as a city council. To the contrary, Justice O'Connor's majority opinion states: "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in

response to it." *Adarand III,* 515 U.S. at 237, 115 S.Ct. at 2117.

There is also little support for Adarand's argument that the Defendants must show that the federal government itself has discriminated against minority highway construction firms. Neither *Adarand III* nor *Croson* require such showing. In *Croson,* the Court recognized that "if the city could show that it had essentially become a 'passive participant' [by providing funding] in a system of racial exclusion practiced by elements of the local construction industry, ... the city could take affirmative steps to dismantle such a system." 488 U.S. at 492, 109 S.Ct. at 721 (plurality opinion).

I conclude the requisite particularized findings of discrimination to support a compelling governmental interest for Congress' action in implementing the SCCs under a strict scrutiny standard of review would include findings of discriminatory barriers facing DBEs in federal construction contracting nationwide, rather than in a single state, whether such barriers were as a result of intentional acts of the federal government or "passive complicity in the acts of discrimination by the private sector." *Croson,* 488 U.S. at 519, 109 S.Ct. at 735 (Kennedy, J. concurring in part). Such a standard, while acknowledging the Court's requirement that there be findings of discrimination in the specific industry where alleged discrimination is sought to be remedied, *see Croson,* 488 U.S. at 497–99, 109 S.Ct. at 724, takes into account Congress' responsibility to address nation-wide problems with nation-wide legislation.

The recognition that Congress' unique role as a national legislature allows it to look at the whole of the United States for situations that may generate a compelling governmental interest in applying race-based remedies does not end the inquiry. Even in looking at this broader picture, Congress must still establish that the interest in eliminating the targeted evil is so compelling that it justifies the use of race, the most suspect of all classifications.

The parties are in substantial disagreement as to the evidence Congress must provide before an interest becomes compelling enough to allow the consideration of race to

be codified into a federal enactment. The Defendants attach Appendix I to their memorandum in support of their motion for summary judgment. This, they submit, reflects evidence of discrimination by private parties, state governments and the federal government in the construction industry. The amici supplement this evidence with additional evidence presented in an appendix to their brief.

The Defendants contend the evidence demonstrates the existence of a wide variety of active and passive discrimination by public and private parties against minority businesses in construction contracting. Congress, they argue, enacted the SCC to serve the compelling governmental interest of remedying the effects of these types of discrimination.

Adarand claims the evidence submitted is of "[s] ocietal discrimination, without more," *Croson*, 488 U.S. at 497, 109 S.Ct. at 724, as such, is "an inadequate basis for race-conscious classifications," *id.*, and does not constitute the requisite particularized findings in the specific industry where the alleged discrimination is sought to be remedied, *id.* at 499, 109 S.Ct. at 724–25. According to Adarand, the evidence set forth in Appendix I is nothing more than iteration of statements by representatives who were sponsoring legislation and cannot be described as evidence of discrimination showing a compelling government interest. *See id.* at 500, 109 S.Ct. at 725. Nor, Adarand argues, is there any evidence of discrimination against all the groups Congress presumes to be "socially and economically disadvantaged" in 15 U.S.C. § 637(d)(3)(C) and 13 C.F.R. § 124.105(b) (1996).

Appendix I recounts the relevant legislative history of the Small Business Administration concerned with developing small businesses, including those owned by socially and economically disadvantaged individuals and providing them with opportunities to participate in the economy, including the construction industry. Although some of the quotations in the appendix are by Senators or Congressmen who sponsored the bills, the Defendants submit this does not diminish the fact that Congress reasonably and correctly

believed that the evidence of discrimination presented was sufficient to require corrective measures.

I agree with the Defendants in this regard. There is a fundamental difference between the record of congressional hearings, including the statements by members of Congress, submitted with the Defendants' brief, and the "highly conclusionary statement of a proponent" of the plan challenged in *Croson*. 488 U.S. at 500, 109 S.Ct. at 725. Justice O'Connor's opinion in *Croson* did not dispute Congress' ability to make such findings, nor the validity of such findings as applied to acts of Congress. *Id.* at 504, 109 S.Ct. at 727. Rather, the majority noted that state or *local* government entities cannot blindly rely on nationwide findings made by Congress as the basis for local race-conscious relief. *Id.* It does not follow, however, that Congress itself, when legislating for the benefit of the entire nation, cannot rely on its own hearings insofar as they establish a nationwide harm.

The limitation with respect to states and local governments set out in *Croson* is a recognition by the Court that state and local agencies must "also establish the presence of discrimination in their own bailiwicks ..." *Id.* I conclude Congress may recognize a nation-wide evil, and act accordingly, provided the chosen remedy is narrowly tailored so as to preclude the application of race-conscious measures where it is not warranted.

Notably, in *Croson*, Justice O'Connor found that Congress had "explicitly recognized that the scope of the problem would vary from market area to market area," by including a waiver provision in the measures challenged in *Fullilove*. *Croson*, 488 U.S. at 504, 109 S.Ct. at 727. Justice O'Connor further observed that in making such findings, Congress "was exercising its powers under § 5 of the Fourteenth Amendment in making a finding that past discrimination would cause federal funds to be distributed in a manner which reinforced prior patterns of discrimination." *Id.*

In sum, the congressional statements contested by Adarand are different in both character and authority from those of the councilman in *Croson*. The record establishes that

the statements by members of Congress were made after exercising the significant and well-recognized fact finding authority vested in that body. They were not the passing comments of a single legislator based on personal experience or popular perception. This, combined with Congress' constitutionally imposed role as the guardian against racial discrimination, leads me to attribute significantly more weight to the evidence in the Defendants' Appendix I than to that brushed aside in *Croson*.

I agree with Adarand that "blind judicial deference to legislative or executive pronouncements" is inappropriate in equal protection analysis. *See Croson*, 488 U.S. at 500–501, 109 S.Ct. at 725–726. However, while it would be improper to accept Congress' stated purpose with a nudge and a wink, it is not beyond the bounds of reason to examine the materials at Congress' disposal and recognize that Congress could have concluded legitimately that discriminatory racial barriers exist. A brief survey of the evidence submitted is instructive.

Appendix I states that, since the enactment of the SBA in 1978, Congress has often reexamined the issue of disadvantage in federal contracting caused by racial discrimination and found such disadvantage to continue. The appendix cites various hearings between 1978 and 1988 evidencing continuing difficulty experienced by individuals suffering from social and economic disadvantage in establishing small businesses after years of discrimination. (Defs.' Mem. Supp. Summ. J., App. I at 3–4.)

In 1988, Congress passed a substantial revision of the 8(a) program, 15 U.S.C. § 637(a), reaffirming its commitment to the elimination of discriminatory barriers faced by small businesses owned by disadvantaged individuals after a finding that discrimination and the effects of past discrimination continued to hinder their development. (*Id.* at 5–6.) The Defendants cite various congressional hearings between 1988 and the present in which Congress has received annual reports from the SBA revealing continued barriers for disadvantaged businesses in contracting and a continued need for remedial programs to address disparities between minority and non-minority businesses. (*Id.* at 6–8.)

Next, the appendix reflects after Congress enacted § 105(f) of STAA in 1982, establishing a 10 percent nationwide goal for subcontracting opportunities on federally assisted DOT mass transit and highway construction projects, it reauthorized the DOT DBE program in § 106(c) of STURAA. (*Id.* at 8–9.) The Senate Report accompanying the bill noted the committee had considered extensive testimony and evidence on the bill's DBE provision and concluded that this provision was necessary to remedy the discrimination faced by socially and economically disadvantaged persons attempting to compete in the highway and mass transit construction industries. The report stated, despite progress, barriers remained "preventing minorities and women from successfully competing in the industry." (*Id.* at 9 (quoting S.Rep. No. 4, 100th Cong., 1st Sess. 11 (1987)).)

The DOT DBE provision was again reviewed by Congress and reauthorized in 1991 in ISTEA. (*Id.* at 8–9). That authorization expires at the end of fiscal year 1997. Congress continues to hold hearings concerning barriers to DBE entry in the construction industry and has determined continuing remedial efforts are necessary. (*Id.* at 9–10.) The appendix also cites annual reports compiled by the Department of Commerce's Minority Business Development Agency bearing out Congress' continuing concerns over the difficulties DBEs have in securing federal procurement contracts. (*Id.* at 10–11.)

Attached to the amici brief are additional materials containing a non-exhaustive list of congressional hearings and reports on discrimination against disadvantaged businesses by private parties and various government agencies. (Mem. P. & A. Amici Curiae, App. at 1–5.) The appendix to the amici brief also refers to the "disparity studies" which have been conducted following Croson in almost every major city in the nation comparing actual utilization of minority owned businesses with availability levels, as required in that case. (*Id.* at 5–11.) The studies show a serious pattern of discrimination across all regions, including Denver, Colorado, and across a wide range of industries. (*Id.* at 5–

8.) Finally, this appendix cites recent academic findings confirming disparate treatment of minority-owned businesses by commercial lenders. (*Id.* at 12–13.)

I am unpersuaded by Adarand's argument that the vast body of evidence before Congress as it considered the challenged enactments, and the numerous studies compiled more recently represent "[s]ocietal discrimination, without more." *See Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848. The record and chronological listing of hearings detailed in the amici appendix, reveal that Congress had a strong basis in evidence from which it could conclude there were significant discriminatory barriers facing minority business. Some of the most notable were "deficiencies in working capital, inability to meet bonding requirements, disabilities caused by an inadequate 'track record,' lack of awareness of bidding opportunities, unfamiliarity with bidding procedures, preselection before the formal advertising process, and the exercise of discretion by government procurement officers to disfavor minority businesses." *See Fullilove,* 448 U.S. at 467, 100 S.Ct. at 2769 (plurality opinion) (quoting U.S. Commission on Civil Rights, "Minorities and Women as Government Contractors," 16–28, 86–88 (1975)).

The holding in *Wygant* that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy," 476 U.S. at 276, 106 S.Ct. at 1848, must be seen in context. *Wygant* concerned the validity of a racial preference protecting minority school teachers from layoff. *Id.* at 272, 106 S.Ct. at 1845–46. The preferences were created with the goal of remedying societal wide discrimination by providing "role-models" for minority schoolchildren. *Id.* Significantly, the only basis espoused by the defending school board for creating such a preference was societal discrimination itself. The Court rightly held that such a broad and categorical harm as "societal discrimination" could not, standing alone, create a compelling interest in imposing racial classifications.

In the circumstances of the instant case, however, Congress was not looking only to general, societal discrimination as the basis

for the challenged programs. The evidence demonstrates that § 644(g) of the SBA and § 106(c) of STURAA are not based on the effects of such amorphous discrimination, but constitute a considered response by Congress to the effects of discrimination on the ability of minorities to participate in the mainstream of federal contracting.

Adarand contends much of the evidence submitted consists of "after action studies," that were not before Congress when it enacted the challenged measures. Such studies, it claims, are not sufficient to prove Congress had a compelling governmental interest before it proceeded to implement race-based measures. *See Shaw v. Hunt,* — U.S. —, —, 116 S.Ct. 1894, 1903, 135 L.Ed.2d 207 (1996) (holding "the institution that makes the racial distinction must have had 'a strong basis in evidence' to conclude that remedial action was necessary, *'before* it embarks on an affirmative-action program.'" (emphasis by the Court) (citing *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49)).

I need not pass on the question of whether "after action" studies, standing alone, might ever present or document a pattern of long standing discrimination sufficient to create a compelling governmental interest in its eradication. I find, on the record before me, Congress had sufficient evidence, at the time these measures were enacted, to determine reasonably and intelligently that discriminatory barriers existed in federal contracting.

Unlike *Shaw,* this is not an instance where the legislature in question failed to consider "the historical events and social-science data that the [proffered] reports recount, beyond what individual members may have recalled from personal experience." *Shaw,* — U.S. at —, 116 S.Ct. at 1903. To the contrary, Congress had ample evidence from which to base its decision to adopt race-conscious relief.

To the extent that "after study" evidence exists, I need not ignore it. Indeed, the Tenth Circuit has held that post-enactment evidence may be properly considered along with pre-enactment evidence when performing strict scrutiny analysis. *See Concrete Works v. City and County of Denver,* 36 F.3d

1513, 1521 (10th Cir.1994); *accord, Contractors Association v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir.1993) (holding it especially appropriate to consider post-enactment evidence where the principal relief sought was an injunction).

The party defending remedial legislation bears the initial burden of production to show the program is supported by a "strong basis in evidence." *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1849. However, the ultimate burden rests on the challenger "to demonstrate unconstitutionality of an affirmative-action program." [13] *Id.* at 277–78, 106 S.Ct. at 1849. I conclude Congress has a strong basis in evidence for enacting the challenged statutes, which thus serve a "compelling governmental interest." The issue remains whether the statutes and regulations are narrowly tailored to serve such interest.

B. *Narrow Tailoring.*

 Under the strict scrutiny test, the use of race to award federal contracts must be narrowly tailored to serve a compelling interest. As mentioned, it is unclear whether Adarand has the burden of showing that the statutory and regulatory scheme is not narrowly tailored to serve a compelling governmental interest, as suggested in *Wygant*, or if the Defendants have the burden of showing that it is, as stated in *Plyler*.

In *Concrete Works*, the Tenth Circuit concluded the governmental entity must present evidence from which the court can conclude that the entity had a "firm basis for concluding that remedial action was appropriate." 36 F.3d at 1522. However, the challenger bears the ultimate burden of showing that the "evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted ... was not sufficiently 'narrowly tailored.'" *Id.* at 1522–23 (quoting *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring in part and concurring in the judgment)).

I note, after the majority in *Croson* found no compelling governmental interest had been established in that case, it observed it was "almost impossible to assess whether the Richmond Plan is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." 488 U.S. at 507, 109 S.Ct. at 729. This language logically suggests, in the context of a program professing to remedy discriminatory barriers in federal contracting, the better identified those barriers are, the more likely it will be for a court to find the measures enacted to eliminate those barriers are narrowly tailored.

I have concluded Congress need not make state-to-state nor city-to-city findings of discrimination before it can find a compelling interest in eliminating documented discriminatory barriers. The lack of such localized findings, however, necessarily requires that Congress exercise particular care in ensuring that its programs responding to such barriers are narrowly tailored.

The Court in remanding this case offered little guidance as to how a race-based remedial approach can be narrowly tailored, asserting only that the lower courts were to determine whether the SCC program "satisfies the 'narrow tailoring test' [the] Court has set out in previous cases," *Adarand III*, 515 U.S. at 237, 115 S.Ct. at 2117. I conclude it does not.

In *United States v. Paradise*, the Court mentioned five factors which may be relevant to the determination of whether an affirmative action remedy is narrowly drawn to achieve its goal: "(i) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority group members in the relevant population or workforce; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties." 480 U.S. 149, 187, 107 S.Ct. 1053, 1074–75, 94 L.Ed.2d 203 (1987).

---

**13.** The issue of the burden of proof is unclear. In *Plyler v. Doe*, the Court held: "With respect to such classifications [that disadvantage a 'suspect class' or impinge on the exercise of a 'fundamental right'], it is appropriate to enforce the man-date of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

In remanding the instant case, the majority alluded to related considerations to be confronted upon remand, namely, "whether there was 'any consideration of the use of race-neutral means to increase minority business participation' in government contracting," *Adarand III*, 515 U.S. at 237–38, 115 S.Ct. at 2118 (quoting *Croson*, 488 U.S. at 507, 109 S.Ct. at 729), and "whether the program was appropriately limited such that it 'will not last longer than the discriminatory effect it is designed to eliminate,'" *id.* (quoting *Fullilove*, 448 U.S. at 513, 100 S.Ct. at 2792–93). Justice O'Connor's observation that "unresolved questions remain concerning the details of the complex regulatory regimes implicated by the use of subcontractor compensation clauses," also relates to the issue of narrow tailoring.

The subject SCCs were not themselves created by any act of Congress. Rather, they were instituted by the CFLHD as one means by which to comply with the congressional requirements in the SBA, STURAA, and ISTEA. As such, both the SCCs themselves and the authority under which they arise must be examined in determining whether the SCC program is a narrowly tailored measure that furthers the government's proffered interest of reducing discriminatory barriers in federal contracting.

Adarand charges the Defendants with misdirecting the attention of this court from the federal statutes serving as the basis and authority for the use of SCCs to the narrower scope of the SCCs themselves. It argues both the SCCs and the provisions in the SBA, STURAA, and ISTEA that cause and authorize their use are not narrowly tailored and do not survive strict scrutiny. I agree with Adarand that the Defendants focus to a greater extent on the SCCs themselves than on the larger picture presented by the congressional enactments.

Specifically, the Defendants argue that in *Fullilove*, the Court upheld the constitutionality of a program that required 10 percent of each contract to be set aside for DBEs. The Defendants assert the SCCs in this case are less restrictive in that they are optional and contain no goals, quotas, or set-asides. Moreover, under the SCC, prime contractors are free to accept bid proposals from any subcontractor, regardless of race or ethnicity. Thus, the Defendants suggest, since the SCCs are less restrictive than the program upheld in *Fullilove*, they should be upheld by this court. Finally, they argue, the majority in *Adarand III* specifically declined to overrule *Fullilove's* "most searching examination" standard, applied when the Court found the arguably less tailored measures in the Public Works Employment Act to be constitutional.

The attempted comparison with *Fullilove* is of limited value in the analysis of the SCCs and the statutes from which they originate. Justice O'Connor stated specifically that, "to the extent (if any) that Fullilove held federal racial classifications to be subjected to a less rigorous standard, it is no longer controlling." *Adarand III*, 515 U.S. at 235, 115 S.Ct. at 2117. The dissents of Justices Stevens and Souter also suggest the majority rejected an argument that *Fullilove* controls the analysis here.[14]

Although the Defendants are correct that the standard applied in *Fullilove* upheld the provisions in the Public Works Employment Act at issue in that case, the majority in *Adarand III* stated it "need not decide whether the program upheld in *Fullilove* would survive strict scrutiny as our more recent cases have defined it." 515 U.S. at 235, 115 S.Ct. at 2117. Because the Court expressly declined to answer this question, I view with caution any comparison between the measures upheld in Fullilove and those at issue here.

**14.** Justice Stevens wrote: "[O]ur obligation to give deference to Congress' policy choices is much more demanding in this case than it was in *Fullilove*. If the 1977 program of race-based set-asides satisfied the strict scrutiny dictated by Justice Powell's vision of the Constitution ... the Court endorses today ... it must follow ... that the Court of Appeals' judgment upholding this more carefully crafted program should be affirmed." *Adarand*, 515 U.S. at 264, 115 S.Ct. at 2130 (Stevens, J., dissenting). Justice Souter stated succinctly "[t]he statutory scheme must be treated as constitutional if *Fullilove v. Klutznick* ... is applied." *Id.* at 265, 115 S.Ct. at 2131 (Souter, J., dissenting).

Adarand contends the SCCs and the relevant statutes and regulations, are not narrowly tailored because the SCC program is not optional. It contends Congress has clearly mandated that its agencies award a certain percentage of federal contracts to groups certified under the race-based presumptions. Citing extensively from the relevant statutes and regulations, Adarand asserts their language demonstrates the use of race-based preferences is mandatory. For example, § 637(d) of the SBA states "[t]he contractor *shall presume* that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities...." 15 U.S.C. § 637(d)(3)(c) (emphasis added). Section 644(g) of the SBA states: "The President *shall annually establish Government-wide goals* for procurement contracts.... The Government-wide goal ... *shall be established* ... at not less than 5 percent...." 15 U.S.C. § 644(g) (emphasis added).

Both STURAA and ISTEA provide "not less than 10 percent of the amounts authorized ... *shall be expended* with small disadvantaged concerns...." STURAA, § 106(c), P.L. 100–17, ISTEA, § 1003(b), P.L. 102–240 (emphasis added). If the CFLHD fails to meet the goals established by and pursuant to the statutes, the Division Engineer "receives a chat from his supervisor." (Robinson. Dep. at 45, lines 6–20).

Adarand points out the SCCs themselves must be included in every contract let by the CFLHD, except those let under the explicit set-asides created by the SBA's 8(a) program. It contends the extra financial "bonus" incentives provided by the SCC causes prime contractors like Mountain Gravel to use DBEs instead of taking lower bids from non-DBE contractors.

The Defendants strenuously oppose Adarand's characterization of the payments authorized by the SCCs as a "bonus" paid to prime contractors for discriminating in favor of DBEs. They claim the SCCs are "compensation" by their very terms, and are designed to compensate prime contractors for the additional sums they may have to expend as a result of hiring DBEs.

Drawing all inferences from the record in the light most favorable to the Defendants, I find in certain circumstances, including those before me, the SCC payments do in fact serve as a "bonus." The SCC states "[c]ompensation is provided to the Contractor to locate, train, utilize, assist, and develop DBE's to become fully qualified in the transportation facilities construction field." (Pl.'s Mot. Summ. J., Ex. A at I–25.) Further, "[t]he Contractor shall maintain records documenting these activities and shall make them available for Government review upon request." [15] *Id.* There is no requirement that a prime contractor expend any funds for the purpose of locating, training etc. Nor is there any provision for adjustment of the amount awarded to a prime contractor if utilization of a particular DBE involves no such extra expenditure.

The SCC requires the contractor to furnish a certified copy of records supporting final amounts paid to or on behalf of DBE subcontractors. However, this phrase cannot be read as requiring documented "extra" expenditures to support DBEs before the prime contractor can be paid under the SCC. Rather, it seems designed to document the contract amount, or money paid to the subcontractor under its bid, probably for the purposes of calculating the amount of compensation the prime contractor will be paid under the SCC. Clearly, the SCC awards additional payment, even in the absence of any additional cost incurred by the prime contractor with regard to its subcontracting to a DBE.

Here, the record indicates retaining Gonzales, a DBE, did not impose any additional cost upon Mountain Gravel. To the extent an SCC payment acts as a gratuity for a prime contractor who engages a DBE, it cannot be said to be narrowly tailored to the government's interest of eliminating discriminatory barriers. Rather, this aspect of the SCC results in the spending of public funds

---

**15.** The Defendants do not dispute that the CFLHD has never requested nor reviewed the reports required of the prime contractors so as to document any efforts made by them to "locate, train, utilize, assist," and develop DBEs.

in a way "which encourages, entrenches, subsidizes, or results in racial discrimination," *Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 790, 39 L.Ed.2d 1 (1974). Where subcontracting to a DBE does not cause an increase in costs, the prime contractor receives additional payment because of a choice based only on race.

Adarand further argues the program at issue is not narrowly tailored because of the random or haphazard presumption of disadvantage available to racial groups that may never have suffered from discrimination in the construction industry, i.e. that it is over inclusive. *See Croson,* 488 U.S. at 506, 109 S.Ct. at 728. For example, Adarand states, there is no evidence that Aleuts, Samoans or Bhutans have been discriminated against in the Colorado construction industry.

The Defendants respond that nothing in *Adarand III, Wygant,* or *Croson* suggests that Congress must make such state-by-state findings. Rather, they assert, persons belonging to the groups deemed by Congress to be socially and economically disadvantaged in the United States because of their race or ethnicity are entitled to this presumption anywhere in the United States, being Congress' domain of legislative jurisdiction.

I agree that Congress' national jurisdiction allows it, where appropriate, to determine that discriminatory barriers exist with reference to specific groups. However, before making such determination, the requirement of narrow tailoring mandates that Congress "inquir[e] into whether or not the particular [entity] seeking a racial preference has suffered from the effects of past discrimination...." *Croson,* 488 U.S. at 508, 109 S.Ct. at 729 (distinguishing its facts from those in *Fullilove* ).

Contrary to the Court's pronouncement that strict scrutiny is not "fatal in fact," I find it difficult to envisage a race-based classification that is narrowly tailored. By its very nature, such program is both underinclusive and overinclusive. This seemingly contradictory result suggests that the criteria are lacking in substance as well as reason.

The statutes and regulations governing the SCC program are overinclusive in that they presume that all those in the named minority groups are economically and, in some acts and regulations, socially disadvantaged. This presumption is flawed, as is its corollary, namely that the majority (caucasians) as well as members of other (unlisted) minority groups are not socially and/or economically disadvantaged. By excluding certain minority groups whose members are economically and socially disadvantaged due to past and present discrimination, the SCC program is underinclusive.

The Defendants argue the SCC has safeguards to ensure that only bona fide DBEs may participate and asserts the CFLHD relies on the Colorado State certification process.[16] They enclose the application forms currently used by the Colorado Department of Regulatory Affairs (DORA). According to the Defendants, Frankie Gonzales was found to be socially and economically disadvantaged because he was Hispanic and his firm met the size standards for certification. The forms submitted by the Defendants set out the mandates of 49 C.F.R. part 23 (1995) and require a substantial amount of information concerning the applicant, including information about racial background and the applicant's gross revenues and property holdings. These eligibility criteria, the Defendants submit, render the program narrowly tailored.

These recent forms are, however, significantly more extensive in their probing than those used when Gonzales first obtained DBE certification from the Colorado Department of Highways in 1985. The earlier forms have been substantially revised. The forms completed by Gonzales are centered almost exclusively on the question of ethnicity, inquiring about minority ownership percentages, and the race of the applicant. (Pl.'s Second Supp. Exs., Ex. K.) They ask whether the applicant firm is "owned and controlled by socially and economically disadvantaged individuals." If so, the firm is required to attach its certification from the

---

16. As noted, Colorado follows the guidelines in 49 C.F.R. part 23 in making such certification decisions. In so doing, it makes "a rebuttable presumption that individuals in the [specified] racial groups are socially and economically disadvantaged." *See* 49 C.F.R. § 23.62 (1995).

SBA's 8(a) program to that effect. Gonzales, when marking the form checked "no" for this question, apparently because he was not certified as an 8(a) participant at that time.

Adarand also attaches the form used by the State of Colorado when it made its certification of Gonzales based on the forms he submitted. It supports a finding that Gonzales was certified solely because of his race. The first question asks the certifying authority to state if, based on the data furnished, the applicant is or is not "an eligible concern." It then requires justification for this determination. On the form pertaining to Gonzales, the entire justification section reads: "Gonzales Construction is a 100% minority owned firm." (Pl.'s Supp. Exs., Ex. K.)

Both the race-centered forms actually used in Gonzales' DBE certification, and the later more inquiring forms submitted by the Defendants, sufficed for certification purposes under the STURAA regulations and the relevant SBA, STURAA, and ISTEA percentage goal provisions. This supports a conclusion that the presumptions of disadvantage set out in federal statutes and regulations are not narrowly tailored to those who have suffered the effects of prior discrimination in that they allow implementation in such a way as to permit an absolute preference to certain business entities based solely on their race.[17] *See Croson*, 488 U.S. at 507–509, 109 S.Ct. at 729–730.

I conclude the statutes and regulations implicated in the SCC program, with respect to the races included as presumptively disadvantaged, do not provide a reasonable assurance that the application of racial criteria will be limited to accomplishing the remedial objectives of Congress. *See Fullilove*, 448 U.S. at 487, 100 S.Ct. at 2779–80. As such, they are not narrowly tailored to serve the interest of eliminating discrimination in the construction industry.

Justice O'Connor drew attention to the issue of whether the differences in the statutes and regulations implicated in the SCC program are relevant to a strict scrutiny analysis. See *Adarand III*, 515 U.S. at 237,

115 S.Ct. at 2118. In my opinion, these disparities further indicate a lack of narrow tailoring.

As the Court noted, the SBA's 8(a) program mandates an individualized inquiry into each participant's economic disadvantage, *Adarand*, 515 U.S. at 237, 115 S.Ct. at 2118 (citing 13 C.F.R. § 124.106(a) (1994)). On the other hand, the DOT regulations implementing STURAA § 106(c) do not require the certifying authorities to make such individualized inquiries. See 49 C.F.R. § 23.62 (1994); 49 C.F.R. pt. 23, subpt. D, App. C (1996)

A similar contradiction exists between various regulations implementing the 8(d) program. Some require 8(d) participants to make the individualized showing applicable to 8(a) participants, although the standards applicable to the factors considered for 8(d) "are less restrictive than those applied when determining economic disadvantage for purposes of the 8(a) program." 13 C.F.R. § 124.106(b) (1996). Others, however, allow potential 8(d) participants to avail themselves of the race-based presumption for social and economic disadvantage. *See* 48 C.F.R. 19.703(a)(2) (1996).

Further inconsistencies exist between the definitions of which socially disadvantaged individuals qualify as economically disadvantaged for the 8(a) and 8(d) programs. Whereas, to participate in the 8(a) program, the individual's ability to compete must have been impaired "as compared to others in the same or similar line of business who are not socially disadvantaged," 13 C.F.R. § 124.106(a)(1)(i) (1996), under § 124.106(b)(1), an 8(d) participant need show such impairment only "as compared to others in the same or similar line of business," 13 C.F.R. § 124.106(b)(1) (1996).

The inconsistencies between these statutes and regulations and the resultant uncertainty as to who may or may not participate in the race-based SCC program preclude a finding of narrow tailoring. As discussed in relation to the different forms which have been used in the certifying process, without a well defined set of consistent definitions, the SCC

---

**17.** Indeed, under these standards, the Sultan of Brunei would qualify.

program cannot provide the "reasonable assurance that the application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively." *See Fullilove*, 448 U.S. at 487, 100 S.Ct. at 2779.

Justice O'Connor also raised the issue of whether race-neutral means were considered before the enactment of the race-based program. *Adarand III*, 515 U.S. at 237, 115 S.Ct. at 2118. Adarand contends they were not. The Defendants respond the CFLHD implements § 644(g) of the SBA and § 106(c) of STURAA. They argue, before enacting the challenged statutes, Congress required the use of race-neutral measures but considered them an insufficient response to address discrimination against minorities in the highway construction business. Moreover, the Defendants maintain race-neutral mechanisms remain in place and the SCC is supplementary to those measures.

The Defendants submit Congress utilized race-neutral measures for at least twenty-five years before amending the SBA in 1978. In 1953 it passed the SBA, allowing the Small Business Administration to enter into contracts with the federal government and subcontract them out to small businesses. However, the Defendants state, in the ensuing fifteen years, minority-owned small businesses continued to be disproportionately excluded from government procurement. As a result, Congress authorized the Small Business Administration to subcontract to socially and economically disadvantaged businesses in an attempt to help minority-owned small businesses. In 1970, to help small businesses obtain surety bonds, the Small Business Administration was authorized by the Housing and Urban Development Act, Pub.L. 91–609, 84 Stat. 1813, 15 U.S.C. § 694a and b, to establish the Surety Bond Guaranty Program. This program covered surety companies for up to 90 percent of their losses on bonds. By 1975, however, the General Accounting Office reported that the "SBA's success in helping disadvantaged firms to become self-sufficient and competitive has been minimal." Library of Congress, Congressional Research Service, Minority Enterprise and Public Policy 53 (1977).

The Defendants assert Congress' 1978 reform of the SBA was based on the ineffectiveness of race-neutral measures in helping minority owned firms overcome the discriminatory barriers in federal procurement. Therefore, they argue, the § 644 goals were established only after Congress determined that the race-neutral alternatives used before the 1978 amendments were not successful in opening opportunities for small disadvantaged businesses.

The Defendants also maintain Congress was aware that numerous other legislative and executive branch remedies, such as anti-discrimination legislation, executive action to remedy employment discrimination in federal contracting, and federal aid to minority businesses, had failed to eradicate discriminatory barriers. For example, minority contractors received less than 1 percent of federal contracts in 1977. 123 Cong. Rec. 7156 (1977) (remarks of Sen. Brooke). Congress determined this was likely the product of discriminatory barriers. H.R.Rep. No. 94–468 at 1–2 (1975). *See Fullilove*, 448 U.S. at 511, 100 S.Ct. at 2791 (Powell, J., concurring) ("[B]y the time Congress enacted [the 'minority business enterprise' ('MBE') set-aside], it knew that other remedies had failed to ameliorate the effects of racial discrimination in the construction industry"); and at 465–67, 100 S.Ct. at 2768–2769 (Burger, C.J. concurring) (finding that Congress had carefully examined and rejected race-neutral alternatives before enacting the MBE set aside).

In its discussion of narrow tailoring, the *Croson* Court found there did not "appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting." 488 U.S. at 507, 109 S.Ct. at 729. This suggests that there must have been an attempt in the industry in question to use race-neutral measures to eliminate racial barriers to minority participation. *Croson* acknowledged, without criticism, however, the findings of the principal opinion in *Fullilove* that Congress had examined and rejected race-neutral measures in the construction industry before enacting the MBE set aside. This approach recog-

nizes Congress' ability to legislate nationwide to address nationwide programs. Based on the numerous congressional records cited by the Defendants here and by the Court in *Fullilove*, I conclude Congress' earlier race-neutral measures sufficed to pass this aspect of strict scrutiny muster.

Adarand further contends the SCC program is not narrowly tailored because "[t]he race-based program at issue in this case awards between 10 and 18 percent of all federal highway construction contracts on the basis of race." (Mem. P. & A. Supp. Pl's. Mot. Summ. J. at 19.) Adarand cites no authority for these "goals," which, it maintains, bear no relationship to the number of available DBEs. Their only justification, according to Adarand, is "outright racial balancing."

Adarand relies on Justice O'Connor's remarks in *Croson* that "the 30% quota cannot be said to be tailored to any goal, except perhaps outright racial balancing. It rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." 488 U.S. at 507, 109 S.Ct. at 729. Justice O'Connor was here rejecting the City of Richmond's adopted plan requiring prime contractors awarded city construction contracts to subcontract at least 30 percent of the dollar amount of each contract to one or more "Minority Business Enterprises."

The Defendants argue, unlike in *Croson*, here the SCC has no project goals, set asides or quotas and a primary contractor is not mandated to make subcontract awards based on race. With respect to contracts containing the SCC, they assert, there is no requirement that primary contractors make subcontractor awards based on the race of the bidder. They maintain in over 87 percent of the contracts containing the SCC awarded in Colorado from the time of the West Dolores project to the date of the filing of the Defendants' motion, the prime contractor did not avail itself of the compensation offered by the SCC. (Defs.' Mot. Summ. J., Ex.5.)

The SCC itself imposes neither goals nor quotas. A prime contractor has the choice to subcontract work to DBE's, and thus qualify for the benefits of the SCC, but is not required to make such choice. This is more flexible than the "rigid racial quota" struck down in *Croson*, 488 U.S. at 499, 109 S.Ct. at 724–25 and the 10 percent set aside upheld in *Fullilove*, 448 U.S. at 513–14, 100 S.Ct. at 2792–93. Nevertheless, the use of the SCC is one means by which the government implements the statutory directives of the SBA, (requiring the President annually to establish Government-wide goals for participation by DBE's procurement contracts, at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year), 15 U.S.C. § 644(g), and STURAA and ISTEA (mandating that not less than 10 percent of the amounts authorized to be appropriated under the acts be expended with small disadvantaged concerns), STURAA, § 106(c), P.L. 100–17 (1987), ISTEA, § 1003(b), P.L. 102–240 (1991). *See Adarand III*, 515 U.S. at 204–07, 115 S.Ct. at 2102–03.

Thus, although the SCCs contain no quotas, they are used as one of the methods to attain the percentage goals in the SBA, STURAA and ISTEA, and are thus inextricably linked with these goals. Insofar as the percentage goals are a foundation for the use of the SCCs, rooted in the same race-based presumptions contained in the SCCs, I find the statutory sections containing those goals insufficiently narrowly tailored for the same reasons as I stated in making that determination regarding the SCCs themselves.

Finally, Adarand states the remedial measures enacted by Congress and implemented by the Defendants are not "narrowly tailored" because they are "unlimited in scope and duration." The Defendants respond the appropriate inquiry is whether the challenged measures have been regularly reviewed to determine whether they are still needed. *See Fullilove*, 448 U.S. at 489, 100 S.Ct. at 2780.[18] They state, since 1982, Congress has regularly reviewed and reassessed STAA, STURAA and ISTEA and retained

---

**18.** Notably, the regulations governing the 8(a) program limit participation therein to nine years from the date of certification and provide for premature termination for good cause.

DBE provisions although in 1987, STURAA's 10 percent goal for DBE participation was modified to include women-owned businesses. The citations in Appendix I, the Defendants assert, reflect numerous hearings before congressional committees and congressional committee reports which show Congress has overseen the operation of these programs to determine whether they are working as intended and has concluded that continuing remedial efforts are needed. The Defendants note, unless Congress makes a further determination of need, the DBE program for highway and transit programs is scheduled to lapse at the end of fiscal year 1997.

The Defendants assert, under 15 U.S.C. § 644(g), government-wide goals are negotiated annually between the head of each agency and the Small Business Administration. They state Congress has reviewed evidence to determine whether the goals are achieving the desired result of remedying discrimination and the lingering effects of past discrimination nationwide and has determined there is a need to continue the DBE requirements of § 644(g).

When and in what circumstances, the SCC program will end seems unclear. However, because I have not found the SCC program to be narrowly tailored based on other relevant factors, I need not rule on the issue of whether the limitations stressed by the Defendants sufficiently ensure that the program "will not last longer than the discriminatory effect it is designed to eliminate." *See Fullilove*, 448 U.S. at 513, 100 S.Ct. at 2792–93.

Finally, relevant to the issue of narrow tailoring, is the degree of burden placed on nonminority businesses by the SCC program. The Defendants note the SCC might have the effect of providing DBEs with contracting opportunities that otherwise might have been available to non-DBEs, but that this incidental consequence does not render the SCC provision constitutionally defective as applied to Adarand. In this regard, the Defendants cite *Fullilove:*

When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a "sharing of the burden" by innocent parties is not impermissible. The actual "burden" shouldered by nonminority firms is relatively light in this connection when we consider the scope of this public works program as compared with overall construction contracting opportunities.

448 U.S. at 484, 100 S.Ct. at 2778 (citations and footnote omitted).

The Court's declaration in *Fullilove* was that such incidental burden may be permissible provided that it occurs in the course of executing a properly tailored remedy. Since I find the SCC program is not properly tailored, I do not reach the issue of assessing the relative burden shouldered by nonminority firms through its implementation.

## VII. *Conclusion.*

For the aforesaid reasons, I conclude the SCC program at issue does not survive strict scrutiny. I therefore grant Adarand's motion for summary judgment, and deny that of the Defendants. Accordingly,

IT IS ORDERED THAT § 106(c) of STURAA, § 1003(b) of ISTEA, § 8(d) of the SBA (15 U.S.C. §§ 637(d)) and 15 U.S.C. § 644(g), the regulations promulgated thereunder, and the subcontracting compensation clause program arising pursuant to those statutes and regulations, are unconstitutional as applied to highway construction in the State of Colorado and thus deprive Adarand Constructors, Inc. of its constitutional rights;

IT IS FURTHER ORDERED THAT the Defendants are enjoined from administering, enforcing, soliciting bids for, or allocating any funds under the said subcontracting compensation programs.